Thank you, your Honor. Alan Loray on behalf of the United States. As the Court is aware, there are several issues raised in this appeal that have been the subject of other appeals before this Court related to the United States. to the spent nuclear fuel cases. Some of those cases have already been decided by this Court. In fact, in March of this year, my colleague, Mr. Lester, provided Chief Judge Rader with a list of common issues that cut across multiple appeals. In this particular case, those issues include the government's challenge to overhead and plaintiff ENGC's challenge to interest, which was the subject, interest generally was the subject of this Court's ruling in ENW. Although I would be happy to address those issues with the Court, I would like to focus, with the Court's permission, upon the three issues which we believe are of first impression before this Court. Do you think that Energy Northwest disposes of those two issues for purposes of this appeal? Energy Northwest, we believe, disposes of certainly the interest case, your Honor. Do you think it also disposes of the overhead question? It may. The government is not pursuing the overhead. In other words, we're resting on what we said in ENW, Southern California Edison, Dominion, and CPNL, which all addressed overhead. The issues of first impression here are the trial court's award of what it deemed to be diminished value regarding Boston Edison's voluntary business decision to transfer certain decommissioning funds to ENGC. The second issue is the Court's refusal to offset spent nuclear fuel storage damages against ENGC to account for S&F storage compensation that it received as part of the sale. And third, the award of NRC fees to ENGC. The trial court should reverse the decision of the trial – I'm sorry, this Court should reverse the decision of the trial court regarding the award of damages to Boston Edison because the Court simply failed to require Boston Edison to establish damages directly – that the damages were directly caused by the breach and that they were foreseeable as a probable outcome as a result of the breach. And, Your Honors, we believe that that failure on behalf of the trial court violates the tenets established by this Court in Indiana, Michigan, in particular, as well as others including Energy Capital, for instance. With respect to foreseeability, doesn't the Anchor Savings case cut against your position? No, Your Honor. Anchor Savings says that the damage must be of a kind that is foreseeable. And our position, Your Honor, is that this damage was not of a kind that would be foreseeable. And to be specific about that, at the time that the contract was let back in 1983, the government certainly understood that under the contract there could be a transfer of the – a sale of the plant. The contract also included an assignment provision. Similarly, we don't dispute that the government understood that there could be alternative storage needs if a plant – if DOE was unable to perform. But what was not foreseeable and what is unusual, as Farnsworth says about the damages that the plaintiff seeks in this case, is that what was foreseeable is that they – the seller could transfer all of its rights under the contract pursuant to the assignment agreement and that the buyer would then step into the shoes. What was not foreseeable is that the plaintiff or the seller would essentially fast-forward its damages to say, I am transferring to you both the right to sue under the contract but also these speculatively – speculative damages that may or may not occur in the future. And that we believe is not foreseeable. Isn't it really that – isn't that the argument that they are not allowed as a matter of law, according to you, to accelerate the damages in a partial breach setting as opposed to foreseeability? It just seems to me that foreseeability is a sort of artificial way of looking at this issue. Now, you make the accelerated damages argument separately, but I see this as really being purely an accelerated damages question. I mean, it seems to me it's difficult to say that some kind of transfer with some kind of arrangement was not foreseeable. But your argument really is that you just can't do this. You can't charge the government now for what damages you will – you or your successor will incur in the future. Well, that's exactly right, Your Honor. We are not quibbling. In fact, as this court said in Oldstone, in some inquiries, and I believe this may be one of them, the foreseeability and the causation analysis essentially collapse on one another. And the fact is that under this court's jurisprudence in Indiana, Michigan, a plaintiff in a partial breach setting, an SNF plaintiff no less, may not essentially fast-forward its damages to say, this is what I anticipate the damage will be in the future and therefore pay me now. Had there been no sale, this would have been essentially a no-brainer because we would have come in and said, Indiana, Michigan controls. The fact that there was a sale, which by the way, and I'm happy to address, had nothing to do with the breach. The fact that a sale occurred doesn't change the law as established under Indiana, Michigan. So would it be your theory that if and when those costs ultimately are incurred that it is Boston Edison that has the right to come back as the damaged party? Yes, Your Honor, because the contract was assigned. Yeah, because of the assignment clause, Boston Edison has a right to sue. Now the problem we have is that if the court says, and this sort of pivots to the NGC portion of the error that we believe the court committed is, if the court says, well, the damages associated with the transfer are recoverable by Boston Edison, then we believe that that amount that Boston Edison receives should be an offset to whatever claims that NGC would have in the future. Is it really an offset analysis or isn't it a basic principle of who suffered the damage? Well, that's exactly right. I mean, there's one contract here and there's one breach. Now, as we explained in our briefs, the LaSalle opinion says essentially when a party takes action, and we understand that that was a substitute transaction, but essentially when a party takes action or somehow receives some kind of compensation or in that case a benefit, then it's simply a question of, okay, the government has now received something in the case of an offset. But more fundamentally, the question is, there is one breach. Does the government pay twice? We don't believe that that is correct. We believe that once the government has paid for those damages, then those damages should be essentially NGC starts with a position that it has received compensation, and once it has used up that $40 million, then it's a question, it may have a right to a claim, but not until it has done so. Otherwise, we're in a position where we are paying double, and that violates the tenets, we believe, of both LaSalle and also the Ninth Circuit in the Kennedy case that we signed. The argument is made that the $40 million increase in the escrow fund is a measure of a diminution in value caused by the breach that comes into play by virtue of this contract of sale. What's your reaction to that? My reaction to that is that that is contrary to what the court found. At JA-28-30, the court expressly found that there was no diminished value. The court said it looked to and there was evidence at trial that other offerors, including ENGC, did not believe that the value of the plant was reduced. In fact, the court held that the price for the plant was not reduced. Well, that's not exactly what the court held. The court said that with respect to the price reduction that had to do with things unrelated to that fund, that there was no basis for awarding damages. But the court specifically said that the risk of non-performance by the government was essentially taken into account by the fund. That's true, Your Honor, but the court didn't expressly—there's nothing in the record that says that the court made a finding that Entergy said, we are not going to buy this plant unless you transfer money related to the breach. In fact, the way the record is established, and this is at JA-29-60 and 30-62, at the time of the offering memorandum, this is before any bids were offered, when the seller was looking for bidders. The offeror or the seller, Boston Edison, said, we are going to transfer a fully decommissioned fund. In other words, in fact, it expressly says at 30-60, we are going to include spent fuel storage costs. So there was—again, it goes back to the causation analysis. There was nothing that said to Boston Edison, you need to transfer this fund. The government didn't say, you need to transfer the money. The seller, or the buyer, rather, didn't say, you need to transfer money associated with spent fuel. There simply is no causal link between— in connection with the decommissioning fund it wanted to receive from Boston Edison, as previously described. So the court specifically finding that that decommissioning fund was determined based on that risk assessment. We don't quibble with that finding, Your Honor, but what we quibble with is that there was no causal link. In other words, under energy capital, this court said that the damages must be directly flowing from the breach. Boston Edison, that was a deal between two private parties. The government had nothing to do with that sale. Now what they negotiated is between them, but the question for purposes of recovery of damages is, did the breach cause those damages? And the fact that Boston Edison may have paid is not, per se, creating a right for them to recover. This would be analogous to, I believe, the Hercules case, where the plaintiff settled with a claimant on, I believe it was Agent Orange claims, and then turned around and sued the government for breach of contract. And the court said, no, those actions that you, Hercules, took were independent of the breach. But the lower court specifically found, made a factual finding, that in fact that's not the case. That it was the fact of the breach that resulted in the obligation to make this payment. Well, I think what I would say without splitting hairs, and I see my time is low, I would say that it is without the breach, if we took out the breach, the payment wouldn't be made. We don't quibble with that. But that is distinct, I believe, under energy capital from the breach, the damages directly flowed from the breach. And I believe the best analogy would be the Hercules case. We are not going to hold you tightly to your time, and we're going to provide a little extra time for the other side, since they have two different parties arguing. Thank you. But let me ask you this with respect to the same question that Judge O'Malley was pursuing. I understand your position with respect to the components of the payment that may have been attributable to anticipated further expenses for the removal of spent nuclear fuel. But how about those portions of any payment that might be attributable to the consequences of the breach in this sense? That even though the purchasing party might ultimately be able to recover for damages that it incurs, that there is a litigation risk and litigation costs associated with that process of recovering those breach-related expenses that will drive down the price. Why shouldn't that diminution in value associated with the difference between what would have been in the but-for world and what actually is in the world in which you have to sue to get your money back, why isn't that recoverable? Because, Your Honor, that is the risk of doing business. In other words, the way I would analyze that question, I thought about it. Well, but the question is on whom does that risk fall? Shouldn't it fall on the breaching party, in this case the government? Or do you just say we breach and you pay for the consequences of our breach? Well, no, Your Honor. The way I would analyze that is to say, what if there wasn't a breach? I'm sorry, what if there wasn't a sale? And had there not been a sale, Boston Edison would have faced those same risks. It would have had to litigate. The government would have had certain defenses that it has put forth in all of the spent nuclear fuel cases. There would be a cost associated with litigation. There would be no interest as our position. And perhaps they would have established an escrow fund to provide a source of funds for that contingency. But had they done that, Your Honor, we believe that under Indiana-Michigan, those costs would not be recoverable. In other words, if a party said, put the sale aside, the party says, I am anticipating, government has breached, I'm anticipating a whole bunch of litigation, so I'm going to put aside costs associated with dry storage and costs associated with recovering my damages. We would come in and say, in the first instance, those are future costs, they haven't been incurred yet, so under Indiana-Michigan you lose. And then secondly, we would say, those are costs that are simply not recoverable against the United States. Obviously there are certain circumstances where EJA or interest occurs, but in these cases, in the spent fuel cases, there is no such recovery. So all we're doing is treating the seller just the way we would had there been no breach. That goes back to your foreseeability argument. It goes back to your foreseeability. Just because you're the government doesn't mean you're not contracting in a business world, and you contemplated a transfer. So businesses get sold and transferred all the time. So at that point, there has to be some value that's put on the fact that there's been this ongoing running breach. Your Honor, certainly we did contemplate the transfer, and there's no dispute there. But again, I take it back to the anchor savings analysis, which is, is this of the kind? Is this recovery, or these claim damages, of the kind that could have been anticipated at the time of the sale? And our answer is no, because again, substantively, we would not pay costs, for instance, of legal fees or of time value of money. And we shouldn't pay them without the sale, and therefore there's no reason that we should pay them with the sale. Whether you look at it from a causation standpoint or a foreseeability standpoint, we do not believe that those costs would be recoverable, because in a foreseeability setting, it would be, as Farnsworth said, unusual type of damage to be looking fast-forwarding and thinking, okay, there may be a sale, and there may be some contingency to cover for litigation, et cetera. Again, I just find the foreseeability to be such an odd way to look at this. It seems to me that the answer you gave earlier is the more direct answer, which is you can't do better by making a sale than you would do by not selling. I'll stick with that answer. Okay, very well. Why don't we hear from your opposing counsel. Now let's see. First, we're going to hear from Mr. Conway, is that right? Or Mr. Wallace? I think Mr. Wallace. Mr. Wallace, very good. We are a cross-talent. I understand. Now, Mr. Wallace, you have reserved some time. I've reserved one of my eight minutes. All right, well, we'll give you a little more than eight minutes, because I understand that you've got a three-cornered situation. I thank the court. I'll try not to impose too much on the court's generosity. I have two issues that I want to be sure to address that are related to damages, and that's the NRC funds, the fees, which we did recover, the cost of capital, which we didn't. At the end, I want to address the government's argument that we ought to give to them the post-shutdown storage fund that we have prudently amassed against that day in exchange for the hope and the litigation risk, as the court has recognized, that we may be able to get the money back from the government when we need it. Do you agree, then, with the government's stipulation that Energy Northwest puts to bed your cost of capital request? It puts to bed part of the issue, Your Honor. We have argued, as many litigants have, that when Congress set on a claim in 2516, it didn't apply to this. Our Wickham argument has been rejected. That's gone. Our Blue Bonnet argument has been rejected. That's gone. I think the Standard Oil argument is still alive and needs to be dealt with. When Congress adopted the statute, it did not change, but it incorporated prior jurisprudence. What Standard Oil says is when the government performs a service that other people perform and does not carry out that service, you're entitled to recover interest, just like any other service provider. We think Standard Oil survives 2516. We think it is a sound analogy for what has been done here, and we believe that Standard Oil supports the recovery of cost of capital. If we're not dead, we're breathing hard. I understand that, Your Honor. But we do think the court will need to address Standard Oil. I do want to turn on to the NRC fees, which the government, I'm sure, would have liked to have had time to address. But I want to express why we think the court got its factual findings right on that issue. The court found as a fact that but for the breach, the NRC would not have amended its rules in 1999 to impose on Entergy the spent fuel storage and reactor decommissioning fee. That was found as a fact. I don't think that fact finding is being challenged here by the government. The court said there were three parts of this fee, generic costs related to wet storage, to dry storage, and to decommissioning. And what the court did, and we think correctly, is compare the real world fee that we had to pay because of the breach, and subtract from it those portions which would have been paid in the unreal world in which the government had kept its promises. What the court first did was take out the decommissioning aspects of the fee. It then took out this separate surcharge. And what was left was wet storage and dry storage. I don't think the government has ever disputed that because we have no dry storage, that's not a fee we would have been paying but for the government's breach. Now we're paying it. Wet storage, we would have paid some fees before the breach. But the court found as a fact, which is not challenged as I understand it, that the NRC generic costs for wet storage increased as a result of the breach. As I understand the argument the government never got to make, it's that in making these determinations, the court put the burden with respect to the description of the plausible but-for world on the wrong party. I don't think the government did that. I'm sorry, I don't think the court did that. I think that would have been a valid thing to do under this court's precedence. But what the court said is but-for causation, that this was but-for, that the fees were caused by the government. We carried the burden of proof on that. And what the court did was to compare the real world against the unreal world by taking the real fee and then cutting out the parts that the court found as a fact, with us carrying the burden, would not have been paid but for the breach. Wet storage in particular, we carried the burden of proof. So you're saying you essentially made the threshold showing of establishing a plausible but-for world, and at that point the court was allowed to go forward? I don't think what we did is to do two things. What the government, I think, says we ought to do is this. First, we start from the ground up and build the but-for world. Then we start from the ground up and build the real world. We started with the real world. And then from the real world, we came from the top down. And we took out the things that we would have paid even if the government hadn't breached the contract. And we carried the burden of causation on every aspect of that. So I think the court did compare the real world with the unreal world. It put the burden on us at every point. And again, our evidence showed that almost all of the wet storage costs were brand new before the breach. The NRC wasn't spending anything to speak of on generic wet storage costs. That was our expert's testimony at page 2233 of the appendix. The non-incremental costs of fuel in the pool would be de minimis. So we think the court did exactly what the government says we should have done, put the burden on us, and we carried it. Let me go briefly to the question of the post-shutdown fund. What the government says is, we believe, a mischaracterization of the transaction. It says, we gained a windfall when we bought this plant. What happened is Boston Edison sold us the plant, the land, and the decommissioning fund. And we paid $80 million in cash. And we accepted all of their obligations under the standard contract. The court found that was a fair market value trade. Indeed, that was the basis of its damage award to Boston Edison. That we paid fair market value, and it was $40 million less than we would have paid absent the breach. If we paid fair market value, we couldn't have gotten a windfall, and we didn't get a windfall. Let me ask you a question. If we agree with the government that on a partial breach, you can't recover diminished in value damages, once that fund is drawn down on, assuming it's drawn down on to the extent of $40 million or $80 million or whatever the extent that it's drawn down on, do you agree that under your contract, it would be Boston Edison that could recover those funds from the government, or do you think you would have the right to recover those funds? I don't think so, and I noticed your Honor's question on that, and I wanted to get to it. Under the contract, we acquired the right to recover for all future breaches. Now, we prudently provided up front for the risk that the government would still be breaching the contract years from now when this plant shuts down, but Boston Edison unequivocally and clearly transferred us the right to all future breaches. That's how we recovered the costs of re-racking the pool. That was a breach for which we were entitled to recover. They didn't pick it up in 1999. They haven't picked it up since. We re-racked the pool. That's our right to recover mitigation costs. At the end of the line, if the government has not breached the contract, we are entitled to recover those breaches. What about 2.2G in the contract that says that any claims of seller-related or pertaining to the DOE defaults accrued as the closing date, whether relating to periods prior to or following the closing date, are excluded from the transfer of assets? We don't believe, and of course this is our principal argument against the Boston Edison recovery, is that we don't believe, in fact, that the post-shutdown commissioning fund had accrued at the time of the breach. The wisdom of Indiana, Michigan, is that you have a sequence of partial breaches. The partial breach that happened in 1998 was the failure to pick up the fuel in 1998, and what this fund addresses, as the government correctly says, is breaches that may or may not happen. So we don't believe that breaches that take place in 2030 are claims that accrued. We do believe that we agree with the government that the diminution in value is wrong. It's wrong because it's not the proper way to apply Rule 348 of the restatement. The restatement rule is a break on—it applies generally to construction contracts, and what it does is put a break on the continuation and the accumulation of repairs. If the building just can't be fixed, it makes no sense to continue to try to repair it. Once you decide to award a diminution in value, at that point you stop paying for repairs. They are alternative, not supplemental, means of recovery, and to apply that here is inconsistent with Indiana, Michigan, because Indiana, Michigan says we want you to keep on making the repairs. Congress wants you to mitigate the damages, and Congress is willing to have the government pay you to mitigate those damages. We've been awarded mitigation, and that's inconsistent up front with the idea of liquidating and resolving all the damages in a single loss of value case. That's what 348 uses loss of value for. It doesn't apply in a case where you're going to keep on making the repairs. So we believe that the $40 million shouldn't have been awarded to Boston Edison, and we believe that even if it is, the court was right in saying there's no reason to have to deal with it when we find out whether or not the government may have a double liability argument. They don't have it yet, and they may someday perform the contract, and that issue will arise, and I will reserve the balance of my time if there are no further questions. We will save you some rebuttal time as well. Mr. Conway. Good morning. Richard Conway for Boston Edison. Again, we'll give you a little bit of extra time in light of the fact that you're not entirely in sync with your party. Thank you, Your Honor. We want to make two points here today. One, that appellants have not met their burden to show that the court of federal claims post-trial findings are clearly erroneous. Secondly, Indiana, Michigan's prohibition on recovering damages or speculative future losses does not apply here. The first point is particularly important because, as you can see from the arguments made by the government, they're essentially quibbling with the findings of fact by the court below. They may cloak it as a legal argument, but they're quibbling with the findings of fact. The court made exhaustive findings of fact below as to the fact that there was a breach, there was a diminution of value, that it was suffered by Boston Edison, that the amount which is not an issue in this appeal was certain, that it was foreseeable, and that it was directly caused by the breach. The court made elaborate findings on that. There's been no indication by the government or by Entergy that any of those findings are clearly erroneous. Their attack, they come from a legal point of view, but this case is all about the findings of fact and whether they're clearly erroneous. There's been no attack on those findings of fact. I think that's critical to our argument. We're talking about key facts supporting the findings that DOE's nonperformance directly caused the breach. I don't think there's any argument that we would not have offered a $50 million, now PV to $40 million decommissioning fund, but for the breach. But even if we accept all those propositions, how do you recover the money in a partial breach context? Aren't we supposed to assume performance in a partial breach? Well, for Boston Edison, once the sale was done, it was a total breach to us because we're done. Under Indiana, Michigan, we don't have a right every six years to bring a new complaint. So for Boston Edison, it is, in effect, a total breach once the sale was done. We had a right under the agreement to sell the plant and transfer the title to the spent nuclear fuel. That was in the standard agreement from 1983. The government understood when they signed that, that it was foreseeable that in a breach, that that would cause the plant and the assets to be less valuable. The court made a specific finding about that. So once we sold the plant, as we had every right to do under the agreement, the breach was essentially total to us because we were done. Now, we did transfer to Entergy the right to sue for future breaches and future damages. But as far as the damages to that point, they were liquidated in the amount that was put into the decommissioning trust, which is $50 million PV to $40.03 million. But what if those funds are never needed? That's no different from the number of cases decided by this court where they have allowed funds for building instances or for studies to store spent nuclear fuel that may not be needed as well. No one knows if and when the government's ever going to take this material. They could take it tomorrow. They could find some other approach. But this court, in a variety of cases cited in our brief, has decided that the cost of an instance, the cost for studies to build instances, are all recoverable because they're reasonable because you have to do something to repair for the storage of spent nuclear fuel. We had acted properly. Our spent nuclear fuel could be stored in our wet pool until 2012 when the plant would shut down. The problem is that when the government wouldn't take spent nuclear fuel, there had to be some mitigation action by us. The court below specifically found that we mitigated damages, mitigated damages, I think JA-21, by determining that we would then transfer the plant, transfer the decommissioning fund to the buyer, and that the amount was liquidated at $50 million. There's no doubt that, based on Mr. Kiger's testimony and the study by Mr. LaGuardia, there's no doubt whatsoever that amount of money and what it was caused by. So as far as we were concerned, our breach was total when we sold the plant. And we had every right to sell the plant. If the government's argument is to prevail, then our right to sell the plant goes away. Our right to sell the asset to transfer the plant goes away because then we're looking at a situation where we have to transfer the plant, retain title to the spent nuclear fuel, and sue for cost $20, $30, $40 million down the road or more. We have a right under the agreement to sell the plant, to sell title to the spent nuclear fuel. And in order for that right to be effective, we have every right to sell it and to mitigate our damages at that point. And mitigation is a point that the court below found. And under restatement 344, 347, and 348, we can recover diminished value or other incidental or other types of damages to make us whole. And there's no doubt that we paid that money in order to provide for the future spent nuclear fuel. In fact, government counsel says that there's no requirement in the record to show that the Entrgy, in fact, asked for a spent nuclear fuel fund. But if you look at JA11, JA11-12, you'll see the court found that Entrgy required an extra $70 million in the decommissioning fund to account for spent nuclear fuel during decommissioning. That $70 million at JA11-12 was comprised of two things. $50 million for spent nuclear fuel storage and $20 million for greenfielding. We're not seeking greenfielding costs. That would have occurred whether the breach occurred or not. Well, how can you unilaterally make this a total breach when you're transferring the ongoing contract with the government's obligations still intact? Well, it is for Boston Edison a total breach once the contract was signed and the transfer was made. We're out of it. Well, yeah, you're out of it, but that doesn't make it, convert it from one form of breach with its own associated damages to an entirely different form of breach. I mean, suppose that you are the owner of a building that's undergoing renovation and the contractor is delayed in the renovation. You can't sell the building and then say, okay, well, now I'm going to treat this not as a partial breach and get damages for the delay. I'm going to treat it as a total breach because we don't have, the building isn't repaired. Down the day we sold it. You wouldn't suggest that that would be a total breach case, right? Well, in fact, if I hired a contractor to come in- No, no, just take, on those facts, if you sell your building to me while the contractor is delayed in performance- In breach? In partial breach by virtue of the delay, but not in total breach because the work is going to be done. It's just being delayed and there's certain expenses and costs associated with the delay. You can't then say, well, I get to treat this as a total breach because I sold the building and the repairs weren't done on the day I sold it, and therefore, to me, it's a total breach, right? Well, in fact, if I don't know when the contractor is going to do that work, whether it's 5, 10, 20 years down the road, it is a total breach because time is of the essence and the work wasn't done properly. The same thing- You're quibbling, I think, with my hypothetical. My hypothetical is you have to treat it as if you held the building, it would be a partial breach. You know, you could say, well, it's a total breach because time is of the essence and you didn't complete it in time. But if you assume with me that it's a partial breach if you hold the building, you can't then convert it to a total breach simply by selling the building. You would agree with me on that, right? Well, not necessarily. If the contractor was supposed to do the work by a certain date and didn't do it by that date, that's a breach. Of course, it's called a partial breach. If the contractor- Let's assume a way time is of the essence. Let's just take an old-style Corbin hypothetical. This is a failure to perform on time and therefore a partial breach, right? Right. And you sell the building during the pendency of that period of partial breach, okay? You don't get to say, okay, now legally it has become a total breach by virtue of my having unilaterally decided to sell the building, right? But I can sue that contractor for any loss I get in selling that building because the building hasn't been fixed. Okay. And principles of partial breach would apply to the determination of that suit. If the building is not fixed and I sell the building and I lose money on the building, I get less profits and I want to make in that building because the building isn't fixed. I can sue the contractor for my loss. Okay. Let's see. Did you have anything else you wanted to touch on before we move on? I want to address briefly the two other points, this intervening causal event theory and the Indiana-Michigan theory. Very well. Why don't you do that if you could briefly? At the court below and the court here, the arguments being made that there were six intervening events that break the causal chain. The court below considered all six events and determined that there was, in fact, no breach of that causal effect. It determined that it looked at all six events and determined that as a result of those, the government's breach, there would have been a breach regardless of those six events. And it made detailed findings of fact on that. Secondly, it is alleged here that there was an independent business judgment by Bossnet and DeSalle. And as a result, that breaks the causal connection. The court considered that below, made detailed findings of fact and determined there was, in fact, no independent business judgment. The final point I want to make, the court has cited, has referred to anchor savings. And we would also direct the court to energy capital. This case is no different, I suggest, than those cases. In anchor savings, because of the breach, anchor savings had to raise capital. It made a business decision to go ahead and sell RPC. It didn't have to sell RPC. It could have sold other assets. It sold RPC. Damage is rewarded. The government argues there, as it argued here, that, in fact, it was too dramatic a breach, too remote, and therefore not causal. This court found that, in fact, it was causal. We are well within the bounds. You upheld the finding of the trial court. Yes, you did. We didn't make a finding. Oh, you upheld the finding of the trial court. That's right. The same thing in energy capital. Energy capital, which is basically a new business, which had speculative, according to the government, future sales and future lost profits. The government said those are too speculative. The court below made detailed findings, based on expert testimony and factual testimony, as to why those damages were, in fact, approximately caused and foreseeable. This court upheld those findings. I would suggest that those cases control this outcome, as well, and should result in the affirmance of the award of $40.03 million. Okay. Thank you, Mr. Conway. Now, we'll have Mr. Larre and then Mr. Wallace for our survey. Thank you, Your Honor. Very briefly, I would like to address the Standard Oil case that Mr. Wallace mentioned. There's a clear distinction between the Standard Oil case and this situation. In Standard Oil, this goes to the interest, the last breath of the interest claim, if you will. In Standard Oil, the government was engaged in the business of insurance. I believe they were insuring ships. That is a clearly commercial enterprise. In this case, what the government is engaging in is the removal and permanent disposal of spent nuclear fuel. And you need to go no further than the Nuclear Waste Policy Act, Section 111A4, which says that the actions that the government are taking are for the public good and health and safety of the public. In other words, this is not something that is a commercial enterprise, so we believe that is distinguishable. With respect to the fees, Your Honor, we do argue, we do believe, that the trial court failed to hold the ENGC to the burden as established under Yankee Atomic. In other words, it did not require that the plaintiff establish its condition in the but-for world. Specifically, what the court said was ENRGY need not quantify the fees. What page are you reading from? Yes, certainly, it's JA57-58. 57-58. All right, go ahead. ENRGY need not quantify the fees that would have been assessed had the NRC not increased the pool of licensees responsible for its generic decommissioning and wet storage activities. That, Your Honor, is a violation of this court's holding in Indiana, Michigan. I'm sorry, in Yankee Atomic. But all that was required in Yankee Atomic was for the party to go forward and assert a plausible but-for world. And the court here specifically found that they had established a plausible but-for world. And beyond that, the court was within its appropriate bounds to then consider what factors might apply in that world. Your Honor, I understand that the court made the finding with respect to a plausible but-for world, but our position is that under Yankee Atomic, it requires to create a plausible but-for world, the party must show its condition with performance. And by letting the plaintiff off the hook with respect to these wet and dry storage fees, it didn't do that. And I would take the court to one other JA site. This is at JA 2232 to 2233. This is the plaintiff's expert on the fees. And the question was, question, you've performed no analysis to determine how much generic decommissioning activity the NRC would be engaged in under Part 171 in the non-breach world, correct? No. And then he says, but we exclude the decommissioning activity from our damages. So it really wouldn't be an analysis that you would perform. In other words, that is the plaintiff saying, we didn't engage in that analysis. That is the analysis required under Yankee Atomic. And the court, by saying that energy need not quantify the fees that it would have incurred in the but-for world, it lets them off the hook. That is inconsistent with this holding in Yankee Atomic, this court's holding in Yankee Atomic. With respect to, I did want to clarify one thing Judge O'Malley said. I want to be clear about the government's position. Our position, this is on the future damages after the $40 million is spent. Our position, and perhaps I misunderstood you when I spoke earlier, is that ENGC, as the assignee of the contract, would have rights going forward. If I said it was Boston Edison, then I misspoke. It would be, as far as the government is concerned, that contract is fully assigned. And so any damages that occur in the future would belong to ENGC, not to Boston Edison. I just wanted to clarify that. Now, with respect to Boston Edison, just several short points, Your Honor. Mr. Conway points to the cost of studies. Well, the cost of studies go to, and he says, well, you pay for cost of studies, so you should pay for future damages in this case. That's not true at all. Cost of studies are studies that a utility is taking in anticipation of running out of fuel. And as we've said before, certainly a direct consequence of the breach would be a need for alternative studies. To analogize what Boston Edison is asking for, which is the cost of hard cost of building buildings in a decommissioned world, is not the cost of studies leading up to an immediate need for spent fuel. So we would make that distinction. Then also, Boston Edison raises this issue of, well, we somehow would be not permitting the plaintiff or the owners of these plants to sell their plants. Again, that's simply not what we're arguing. What we're arguing is that if the seller wants to sell, that's perfectly within their purview. But to do that, they can do that under the contract. The assignment clause permits, as there have been other sales. Since this sale, there was the sale of the Con Edison plant, for instance, and other sales. The contract certainly permits the seller to sell, passing on those rights to recovery when the damages are incurred. That's what Indiana, Michigan holds. And then the last thing, Your Honor, is Section 348, and we expend a lot of ink in our briefs on this. Section 348, which Boston Edison cites, too, again, that contemplates a total breach scenario. This is not a total breach. No matter what the plaintiff argues here, what Boston Edison argues, they are suing under a partial breach theory. The analogy that I would use, Your Honor, would be if there was a contract, and I had a contract for the trash collection in my house, and I had a big yard, and I could keep that trash without the need for actually building a storage shed, a very big shed, and somebody breached that contract, and then I went to sell the house. If I sold the house and said, here you go, buyer, you have the right to sue the contractor who hasn't shown up, but in addition to that, I'm going to give you the cost that I think it's going to cost to build this shed at some day. It may or may not, but this is what I'm guessing it's going to cost. That would be a violation of Indiana, Michigan. And going to the point that the court made with Mr. Conway, the fact that we still, that that trash collector still had an obligation to take the trash, that means that that recovery would be under the rubric of a partial breach, not a total breach scenario. If there are no further questions, I will conclude. Thank you, Mr. Cronin. Mr. Wallace, you have a little bit of time left. Two very quick points, may it please the court. Everything Congress does is for the public good, or at least Congress thinks so. When Congress went into the insurance business in World War I, it did so for the public good. What the Supreme Court said is when you go into the insurance business, you ought to be treated like you're in the insurance business and you ought to pay a donation. Yes, that's certainly true. But the court has long drawn a distinction between more commercial type activities that the government engages in and more executive public type activities. When the government raises an army, they're not engaged in the commercial activities. When they sell goods on the market, they are. The court may choose to draw that distinction here. The Supreme Court has drawn it. It's a pretty well established line, right? But in this case, we believe there is nothing inherently governmental about waste disposal. It is something that commercial enterprises do, and because the government has breached its obligation under this contract, it is something commercial enterprises are doing. Every waste disposal in the nuclear field right now is being done by a commercial enterprise. We think Standard Oil indicates that Congress would have wanted us to be paid for that, but that's an issue that we think the court still has to address. But one thing about mitigation. It is certainly true, as Mr. Conway says, that the court did talk about Boston Edison's steps to mitigate, but the steps it took didn't actually mitigate. What the court says on page 19, this case involves mitigation, but at a level one step removed from the actual measure of damages. The actual measure of damages is a couple of decades down the road when we actually do the mitigation. And what the court said is that as part of the sale negotiation, the two parties estimated the cost of the mitigation to come, and the court recognized that as reduced value. But that's not mitigation itself. What this court said Congress wanted us to do when the government did not keep its promise, this Indiana-Michigan says Congress wanted the operator to do the government's job, and Congress wanted the operator to be paid for doing the government's job. Boston Edison didn't do the government's job. Instead, it chewed off its leg to get out of the trap, and it sold us the leg and the trap at what the court found to be fair market value. The leg is the money that we prudently set aside to take care of post-shutdown. We're entitled to that. The government's not entitled to get it back, and neither is Boston Edison. We ask the court to reverse its Boston Edison and to grant us our damages. Thank you, Mr. Wallace. And we thank all counsel. The case is submitted.